61 P.3d 1165 (2002)
John CITOLI d/b/a Citi Productions, Appellant,
v.
CITY OF SEATTLE, a Washington municipal corporation; Paul Schell, a married man; Norm Stamper, a married man; Seattle City Light, a Washington Public Utility; and Puget Sound Energy, a Washington Corporation, Respondents.
No. 49188-1-I.
Court of Appeals of Washington, Division 1.
November 25, 2002.
Publication Ordered January 21, 2003.
*1169 David W. Silke, Seatle, WA, Gregory E. Thulin, Bellingham, WA, for Appellant.
Thomas S. Sheehan, Jennifer Tran, Seatle, WA, for Respondents. *1166 *1167
*1168 KENNEDY, J.
John Citoli operated his packaging fulfillment business on the first floor of the three-story Kalberer Hotel building located at 914 Virginia Street in downtown Seattle. Citoli was the only tenant; the upper two floors of the building were vacant. On the eve of the World Trade Organization (WTO) Conference held in Seattle November 30 through December 3, 1999, a large group of protestors gained entry to the building without permission, occupied the upper two floors, and commenced to barricade the building. Police ordered Seattle City Light and Puget Sound Energy to terminate utility services to the entire building. The protestors remained in the building throughout the ensuing week; electricity and natural gas services were not restored until the protestors left. In the meantime, despite his fear of injury from the protestors, Citoli tried his best to operate his business, by flashlight and by use of a small generator to run his business machines. But his business suffered irreparable losses, and ultimately closed. Citoli brought this lawsuit against the City of Seattle, former Police Chief Norm Stamper, former Mayor Paul Schell, Seattle City Light, and Puget Sound Energy, seeking damages for his economic losses and emotional injuries arising from the termination of utilities to his business and the failure to restore them while the protestors remained in the building, and from the failure of police to forcibly evict the protestors. The trial court dismissed all of Citoli's claims on summary judgment, and Citoli appeals. Notwithstanding our sympathy for Citoli's plight, we affirm because the defendants were entitled to summary judgment as a matter of law.

FACTS
This being a review of summary judgment proceedings, we recount the facts in the light *1170 most favorable to John Citoli, the nonmoving party. Mr. Citoli started his packaging fulfillment business, Citi Productions, in the basement of his house in 1993. In 1994, Citoli moved his business into the first floor of a three-story building located at 914 Virginia Street in downtown Seattle.[1] In the late fall of 1999, Citoli was the sole tenant in the building; the second and third floors were vacant.
In January 1999, the City of Seattle was chosen to host the WTO Conference, which was to be held November 30 through December 3, 1999. During the week of the WTO event, including the weekend before the conference was scheduled to begin, the police were operating through a special headquarters known as the Seattle Police Operations Center (SPOC), which is an internal command post used by the police department during emergency situations. The City was coordinating events from its Emergency Operation Center (EOC), which is a City counterpart to the SPOC.
On Sunday evening, November 28, 1999, police responded to a number of protests, demonstrations, and marches. Considerable police resources were also required to begin staffing the WTO Conference site and to conduct a security sweep. At approximately 11 p.m., Sergeant Robert Robbin of the Seattle Police Department responded to a situation developing at 914 Virginia Street. Robbin saw a crowd of 35 to 40 people standing in front of and across from the building, as well as a number of people inside and on the roof. A female with a hand-held radio, who identified herself as "the liaison," told Robbin that the people inside the building were WTO demonstrators, and that they wanted to stay in the building through the week and emphasize the plight of homeless people in Seattle. Robbin tried to negotiate a fire department inspection, and to get the protestors to leave the building, but to no avail. He could hear the sounds of construction work going on inside the building. People on the roof were acting as "spotters." The occupation of the building appeared to be well-coordinated. Sergeant Robbin concluded that the protestors were attempting to barricade the building, which made him concerned about the safety of attempting a forcible entry.
Later that evening, Captain Dan Oliver, the nighttime supervisor, arrived at the scene. Oliver could hear construction noises and the sound of power tools being used inside. He concluded that the protesters were attempting to fortify the building and set traps for officers in case of a forcible entry. Captain Oliver questioned whether the police department had legal standing to forcibly evict the protestors, because the building's owner had not yet been found. Captain Oliver decided that the best course of action was to shut off the gas, electrical power, and water to the building and to negotiate for a peaceful resolution, consistent with standard police practices, rather than to attempt a forcible entry. He felt that a forcible entry would not be prudent, given the extreme risk of fire as well as the high risk of serious injury to police and protestors. Captain Oliver subsequently explained that it was important to shut off the gas to avoid contributing to fire danger, and to shut off the power so that the protestors could not use power tools to continue to fortify the building or to set traps. At approximately 1:30 a.m. on Monday morning, November 29, Captain Oliver contacted the EOC with a request to terminate utility service to the building; EOC contacted Puget Sound Energy and Seattle City Light and directed them to shut off the utilities. In response to the police order, Puget Sound Energy and Seattle City Light workers disconnected the gas and electricity service to the entire building.
In the early morning hours of Monday, November 29, Assistant Chief Harvey Ferguson wrote a memorandum summarizing the events surrounding the takeover of the building. Police were not yet aware that Citoli's packaging fulfillment business occupied the first floor of the building. Ferguson wrote that the SPOC had contacted the owner of record, who told them that he had sold the building 5 months ago to some individuals in Portland; the SPOC would attempt to determine their identity the next day. Assistant *1171 Chief Ferguson estimated that 75-250 people occupied the building. It appeared that the protestors intended to barricade the upper floors of the building and to make it more livable for their stay. Assistant Chief Ferguson, Captain Oliver, and other officers at the SPOC concluded that:
1. At this point we have no legal standing to evict them.
2. The greatest risk is from fire hazard.
3. The protestors will likely be gone by Wednesday, as they probably arrived today and will likely leave after Tuesday's activities, rather than stay another night in what we believe to be a building without light, heat, or water.
4. Overheard conversations lead us to believe that the occupants have now barricaded the building from the inside and are fearful that the police will storm the building.
5. Even with legal reason to do so, eviction would be very difficult with the staff available this evening. It would be better to attempt any such action during the daytime, particularly on Tuesday during the march when most of the protestors will be away from the building.
Clerk's Papers (CP) at 710.
The SPOC determined that the best course of action was to have the police, fire and health departments negotiate with the protestors to allow inspections to ensure that the building presented no imminent fire or health hazard. Ferguson also wrote that "[a]t about 0130 Captain Oliver advised that he would like water, power, and gas shut off so as to allow him to negotiate their return in exchange for fire and health inspections." Id.
When Citoli arrived at the premises for work at 8:30 a.m. on Monday, November 29, police informed him that the utilities had been disconnected. Citoli spent much of that day on the telephone trying to get the utilities reconnected, but to no avail. Citoli was at the premises 9 to 10 hours a day, every day during and after the WTO Conference. Citoli tried to get his work done using flashlights, battery-operated camping lights, and a generator that would only operate one business machine at a time. He received threats from some of the protestors, and feared that they might damage his business or physically harm him.
According to Citoli, the electricity could be disconnected to the second and third floors while maintaining electricity to his business on the first floor. Citoli claims that Seattle City Light knew this because his power bill was addressed to "914 Virginia St # FL/1." CP at 106. Citoli testified at his deposition for this lawsuit that on Wednesday, December 1, two unnamed Seattle City Light workers arrived at the premises and offered to reconnect power to Citoli's business on the first floor, but a Seattle City Light supervisor ordered them not to reconnect the power and to leave the premises immediately. Citoli also said that Puget Sound Energy had checked out a billing problem at Citoli's business the previous year and had determined that the gas lines ran only to the first floor. Therefore, according to Citoli, shutting off the gas unnecessarily harmed his business but did nothing to dislodge the protestors.
At approximately noon on Tuesday, November 30, former Mayor Paul Schell officially proclaimed a state of emergency in downtown Seattle. The protestors did not leave the premises until Friday or Saturday, December 3 or 4, 1999. On Sunday, December 5, 1999, Seattle City Light restored electrical service to Citoli's business. On Monday morning, December 6, 1999, Puget Sound Energy received a request from an unidentified caller to restore natural gas service to the building. The gas service was restored at 9:45 a.m., that day.
Citoli filed suit against Seattle City Light, the City of Seattle, former Mayor Paul Schell, and former Police Chief Norm Stamper (collectively, the "City Defendants") and Puget Sound Energy, alleging breach of contract, negligence, tortious interference with business relationships, outrage, and damages under 42 U.S.C. § 1983 for civil rights violations. According to Citoli, because all utilities were terminated to his business for a full week, and because the police failed to remove the trespassing protestors from the building by force, he lost clients and incurred substantial *1172 costs in attempting to complete jobs in progress.[2] Citoli alleged that he lost existing clients because he was unable to receive calls or to address their concerns, and that he probably lost new business from potential clients who may have tried to call during that week. Citoli also alleged that he was unable to fulfill approximately 25 job obligations during the week that utilities were cut to his business. Citoli's business never recovered, and it has been shut down. Citoli has been diagnosed with post-traumatic stress disorder, and takes a variety of prescription drugs for treatment of panic attacks, anxiety attacks, insomnia, and depression.
At deposition, Assistant Chief Ferguson testified that it is standard policy in barricaded building situations to attempt to negotiate a peaceful removal, and that forcible entry and forced removal is a last resort. He testified that terminating utilities is "a very common tactic that's used in barricaded situations as part of discomfort techniques, to try to encourage people to come out of a location." CP at 715. Assistant Chief Ferguson thought Captain Oliver might also have wanted to terminate gas service because of the risk of fire. When asked whether police feared explosive devices, Assistant Chief Ferguson testified:
I don't recall any information about that. I know we had a fear that a fire might start in there because they might start using wood to build fires to get warm or something like that, but I don't recall any belief that, for instance, there was a bomb inside.... We had reports that they were buying out lighter fluid, but we didn't think [it] was being used to create [explosives].
CP at 716. Assistant Chief Ferguson thought the takeover was a "major issue," in that if someone were to be killed during a forced entry, or if the building caught fire, it "would dramatically shape the direction of the rest of the week." Id. However, Assistant Chief Ferguson did not think the occupiers posed a threat of violence or property damage.
Former Police Chief Norm Stamper testified that "the general sense was these were demonstrators planning to use 914 Virginia... as some kind of headquarters for their strategic and tactical planning for disrupting the WTO conference." CP at 520. Chief Stamper said, "I would have been surprised had utilities not been terminated in an incident where we are attempting to use tactics and strategies to coax or otherwise urge people out of a building that they've occupied." CP at 523. It was also a "tactical edge" for the police to know where the protestors were at certain times of the day. CP at 139. Chief Stamper testified that there was concern about the possibility of incendiary devices and fire hazards within the building:
The principal concern for the police was are they booby-trapping the building, are they creating a situation that might give rise, I heard the expression, to another Waco, is there a possibility that with incendiary devices inside that the entire building could go up. So there were major concerns.
CP at 528. He also explained that reports of anarchists in the building heightened police concerns about the potential for a violent confrontation:
Anarchists have clearly made their intention known, as did some others who wouldn't fall into the category of anarchists, that they were going to close down WTO by any means necessary, which meant that they were bent on destruction and violence, property destruction and the likelihood of violence.
Id. Chief Stamper testified that disconnecting gas to the building would "[b]e the first thing to do" in such a situation. Id.
George Inama, Puget Sound Energy's manager in charge of emergency response and control of gas, testified that the threat of property destruction associated with the takeover of the building warranted disconnection of the gas:

*1173 Any destruction to gas lines, gas meters or gas appliances could result in a gas leak.... Once a leak occurs, when the mix of gas and air reaches four to fourteen percent, it is termed the "explosive limit." At that point, ignition or explosion will occur if there is an ignition source. The incendiary devices reported to be in the possession of the protestors and anarchists are one ignition source, but there are many other less obvious ignition sources including matches, cigarette lighters, alarms, doorbells, telephones and electrical switch[es]. When the building at issue has multiple floors, which was true in this case, the leaking gas would move from floor to floor. Thus, the ignition source need not be located in the same area where the gas leak occurs. When the explosive limit occurs in a confined setting such as a building, and there is an ignition source, explosion will occur.
CP at 531.
Assistant Chief Ed Joiner testified that the police department's usual approach to a takeover situation is to negotiate peacefully rather than storming in. Assistant Chief Joiner did not know specifically why police did not attempt to isolate the termination of utilities to the second and third floors, but surmised that a site commander would probably try to do that "if that's something that's feasible without any sharp conflict." CP at 131. Assistant Chief Joiner said that at first he thought the occupiers were a group of homeless people, but later in the week he learned there might be anarchists in the building who were using it as a headquarters for their activities. Assistant Chief Joiner thought the entire incident at the building had been blown out of proportion:
There was a fair amount of criticism that the police department had not taken more stronger action in dealing with it, and I felt that given what the city was facing that particular week, massive demonstrations downtown, we had made, what, in excess of 600 arrests, I mean, our department was taxed to the maximum, using all of the available resources that we could even bring in, including the Washington National Guard. And I looked at the Kalberer Hotel as, quite frankly, something that paled in comparison with what we were dealing with.
And we monitored it, no one was hurt, the property damage could be repaired, and I simply didn't think it was a situation that warranted forceful police action, given all that was going on at the time.
CP at 132. Assistant Chief Joiner also stated that police did not want to forcibly enter the building out of concern that it might give the protestors a "rallying [c]ry" or create an incident that would give the protestors "ammunition" to use against the police. Id. Assistant Chief Joiner also confirmed that it is a standard tactic to disconnect utilities in a building takeover situation, and that later in the week they did have reports of possible incendiary devices in the building. Assistant Chief Joiner authorized a forced entry, but only if absolutely necessary to make felony arrests, if the officers were mentally and physically prepared for it, and not to do so if there was a very serious risk of the building "becoming an inferno." Id. at 134.
Puget Sound Energy and the City Defendants each moved for summary judgment dismissing Citoli's claims. The City Defendants also moved to strike portions of Citoli's declaration and deposition testimony. The trial court entered two orders granting summary judgment and dismissing all of Citoli's claims, but did not enter a written order on the City Defendants' motion to strike. The trial court denied Citoli's motion for reconsideration of both summary judgment orders. Citoli appeals.

ANALYSIS
A trial court's grant of summary judgment is reviewed de novo by the appellate court. Green v. A.P.C., 136 Wash.2d 87, 94, 960 P.2d 912 (1998). Summary judgment is appropriate if there is no genuine issue of material fact and the party bringing the motion is entitled to judgment as a matter of law. CR 56(c); Christen v. Lee, 113 Wash.2d 479, 488, 780 P.2d 1307 (1989). The court must consider the facts in the light most favorable to the nonmoving party, and the motion should be granted only if reasonable persons could reach but one conclusion. Marincovich v. *1174 Tarabochia, 114 Wash.2d 271, 274, 787 P.2d 562 (1990). If the nonmoving party "`fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial,' then the trial court should grant the motion." Young v. Key Pharmaceuticals, Inc., 112 Wash.2d 216, 225, 770 P.2d 182 (1989), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
1. Inadmissible Statements
As a preliminary matter, the City Defendants argue on appeal that certain portions of Citoli's declaration and deposition testimony should be stricken as hearsay. Affidavits submitted in support of, or in response to, a motion for summary judgment must set forth such facts as would be admissible in evidence, must be made on personal knowledge, and must affirmatively show that the affiant is competent to testify as to his or her averments. CR 56(e); Grimwood v. University of Puget Sound, Inc., 110 Wash.2d 355, 359, 753 P.2d 517 (1988).
Citoli declared that electrical power could be terminated to the second and third floors while maintaining service to his floor:
The electric power [supply] which Seattle City Light supplied to me was routed through a line and a meter which was separate from those used to supply power to the second and third floors of the building at 914 Virginia Street. Thus, electric power could be terminated to the second and third floors while maintaining service to my business.
CP at 98. In support of this testimony, Citoli cites out-of-court statements made by unknown Seattle City Light workers: "Seattle City Light Representatives acknowledged this fact and were prepared to reconnect the electrical power to my business on Wednesday, December 1, 1999." CP at 99.
The out-of-court statements by the Seattle City Light workers were offered by Citoli to prove the truth of the matter asserted: that it was possible to reconnect utilities to the first floor while leaving the second and third floors disconnected. These particular statements must be stricken as hearsay.
But although Citoli failed to state explicitly in his declaration that he knew personally that the electrical power supplied to his business was separately metered, viewing his testimony as a whole, common sense dictates that he was speaking from personal knowledge. A business owner who is the sole tenant on a floor in a multi-story building would naturally insist upon paying for only that power actually consumed by his businesswhich necessarily would require a separate meter. Citoli ran his business from the first floor of the building and paid his electricity bills for 5 years before the events giving rise to this lawsuit; thus the record contains evidence rationally supporting a basis of knowledge with respect to his allegation that the business was separately metered. Accordingly, we deny the motion to strike that particular portion of Citoli's testimony, and will presume for purposes of summary judgment that it would have been possible for Seattle City Light to reconnect electrical service to Citoli's business without doing so for the other floors in the building.
2. Breach of Contract
We now address the merits of Citoli's claims. Citoli argues first that Seattle City Light is liable to him for breach of contract.[3] To bring a cause of action for breach of contract, Citoli must establish the existence of a valid and enforceable contract, the rights of the plaintiff and obligations of the defendant under the contract, violation of the contract by the defendant, and damages to the plaintiff. 17B C.J.S. CONTRACTS § 640 p. 357 (1999).
According to Citoli, Seattle City Light breached its contract without justification when it disconnected electrical service to the entire building, not just to the second and third floors. SMC 21.29.110(V) provides that electrical services may be interrupted *1175 due to an emergency: "EmergenciesDuring an emergency declared by appropriate civil authority, the Department shall have the authority to curtail electrical service to any customer." Citoli argues that there was no emergency justification to terminate utilities early on Monday morning, November 29, 1999. First, he claims that there was no "emergency declared by appropriate civil authority" until Mayor Schell declared an emergency at approximately noon on Tuesday, November 30, after the utilities had already been disconnected. Second, Citoli argues that the takeover of the building by the protestors was not an "emergency." According to Citoli, Assistant Chief Ferguson's memorandum and testimony confirm that there was no emergency at the premises when utilities were shut off.
Citoli's breach of contract claim fails as a matter of law. SMC 21.49.110(U) absolves Seattle City Light from liability for interruptions of electrical service due to circumstances beyond its control:
The Department shall not be liable for any loss, injury, or damage resulting from the interruption ... of electric service from any cause beyond the control of the Department, including, but not limited to ... riots, ... civil, military or governmental authority ... and acts or omissions of third parties.
This provision applies regardless of whether there was an "emergency declared by appropriate authority." Seattle City Light received a police order transmitted through EOC to shut off electricity to the building. This was a circumstance beyond its control. Seattle City Light's contractual duty to provide electrical service does not impose upon it a duty to second-guess police orders based on the absence of a formal declaration of emergency from the Mayor.
Moreover, Citoli's reading of the term "emergency" is too narrow. According to Citoli, there cannot be an emergency if there is any time to deliberate before taking action. "Emergency" is not defined in the Seattle Municipal Code. Black's Law Dictionary 522-23 (1990) defines "emergency" as:
A sudden unexpected happening; an unforeseen occurrence or condition; perplexing contingency or complication of circumstances; a sudden or unexpected occasion for action; exigency; pressing necessity. Emergency is an unforeseen combination of circumstances that calls for immediate action without time for full deliberation.
Webster's Third New International Dictionary 741 (1969) defines "emergency" as "a pressing need" or a "distressing event or condition that can often be anticipated or prepared for but seldom exactly foreseen." The record indisputably establishes that police had valid safety concerns at the time utilities were terminated. Although police may initially have had some difference of opinion regarding the threat of incendiary devices or the risk of violence posed by the protestors, the record clearly indicates that the protestors were using power tools to barricade the building against the possibility of forcible police entry, and that police were extremely and justifiably concerned about the potential for a major building fire, as well as the dangers posed by a forcible entry into the building in terms of injury to police and protestors alike. As for the duration of the loss of power, by noon on Tuesday, protestors had entirely blocked streets and intersections surrounding the Convention Center, anarchists were running rampant and breaking store windows in the downtown area, and the Mayor had declared an official state of emergency. By the middle of the week, police had reports of incendiary devices and the presence of anarchists in the building. The specter of another "Waco" only served to heighten their concerns. We conclude that the takeover of the building by protestors was a "distressing event," the parameters of which could be "anticipated or prepared for" but could not be "exactly foreseen." In other words, the takeover of the building by protestors constituted an emergency.
In sum, Citoli's breach of contract claim against Seattle City Light fails as a matter of law.
3. Negligence
Citoli next argues that Seattle City Light is liable for negligence, in that it violated *1176 state law by disconnecting power to the entire building and failing to reconnect power to his business until Sunday, December 5, 1999. To prove a claim for negligence, Citoli must establish (1) the existence of a duty, (2) a breach of that duty; (3) a resulting injury; and (4) that the breach was the proximate cause of the injury. Reynolds v. Hicks, 134 Wash.2d 491, 495, 951 P.2d 761 (1998).
Under RCW 80.04.010, Seattle City Light is both an "electrical company" and a "public service company." Accordingly, it is liable for its acts and omissions in violation of law:
In case any public service company shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done, either by any law of this state, by this title or by any order or rule of the commission, such public service company shall be liable to the persons or corporations affected thereby for all loss, damage or injury caused thereby or resulting therefrom[.]
RCW 80.04.440.
Interruptions of serviceeach utility shall endeavor to avoid interruptions of service, and, when such interruptions occur, to reestablish service with a minimum of delay.
When it is necessary for a utility to make repairs or to change its facilities the utility may, without incurring any liability therefor, interrupt service for such periods as may be reasonably necessary, and in such manner as to minimize the inconvenience to customers[.]
Former WAC 480-100-076.[4]
Citoli contends that Seattle City Light breached its duty to avoid interruptions of service and to minimize inconvenience because it disconnected electricity to the entire building when it could have only disconnected service to the second and third floors. Citoli further contends that Seattle City Light breached its duty to reestablish service with a minimum of delay because it could have reestablished service to his business on December 1, when electrical workers came to the building, but did not do so until December 5.
By showing that the power supply to his business was separately metered, Citoli has raised an inference that power could have been shut down to the second and third floors of the building while maintaining power to the first floor. But it does not follow that Seattle City Light breached its statutory or regulatory duty by following the order to terminate power to the entire building or by failing to reconnect power to Citoli's business while protestors still occupied the building. As previously discussed, SMC 21.49.110(U) limits Seattle City Light's liability for interruption of electrical service due to circumstances beyond its control, including civil or governmental orders. The Seattle Police Department, acting through the EOC, ordered utilities terminated to the entire building at approximately 1:30 a.m. on Monday morning, because of the building takeover. Citoli claims that "Seattle City Light is not being sued because of its compliance with a civil order[.]" Reply Brief of Appellant at 9. But Citoli has not fully explained what he thinks Seattle City Light should have done, in the face of the governmental order. Followed to its logical conclusion, his argument would seem to be that when Seattle City Light received the order to shut off the power, it should have told the EOC that it could not comply with the request until it ascertained (1) whether any portions of the building remained free of trespassers; (2) if so, whether the non-occupied portion had a tenant with a Seattle City Light contract; (3) if so, whether that tenant wanted or needed electricity to remain on under the circumstanceseven if it meant that the protestors might invade the business premises in search of power that was not available elsewhere in the building; and (4) whether the police would mind leaving electricity to the first floor connected. This is not a reasonable expectation. The general duty imposed by former WAC 480-100-076 to minimize delay must be viewed together with liability limitations embodied in SMC 21.49.110(U) and SMC 21.29.110(V). Municipal ordinances and statutes are to be harmonized if possible. *1177 Heinsma v. City of Vancouver, 144 Wash.2d 556, 566, 29 P.3d 709 (2001).
The police acted in response to an emergency situation and reasonably ordered that power to the building be shut down. This situation was beyond the control of Seattle City Light. Without a duty to act in the manner Citoli demands, there can have been no breach of duty, and Citoli's negligence claim against Seattle City Light fails as a matter of law.[5]
4. Breach of Tariff
Citoli next argues that Puget Sound Energy breached its Tariff by interrupting his gas service, and is, therefore, liable to him for damages.
Rule 12 of the Tariff is entitled "Company Responsibility." Section 2 of Rule 12, "Interruption of Service," states in relevant part:
The company may interrupt its gas service, however, for the purpose of making necessary alterations and repairs, but only for such time as may be reasonable or unavoidable; and except in case of emergency, the company will give customers reasonable notice of its intention to interrupt service, and will endeavor to arrange such interruption to inconvenience customers as little as possible.
Whenever conditions stated above occur or the company deems an emergency warrants interruption or limitation in the gas service being rendered, such interruption or limitation does not constitute a breach of contract and does not render the company liable for damages suffered thereby or terminate the contract with the customer.
Rule 12 of the Tariff; CP at 200.
Rule 14 of the Tariff is entitled "Force Majeure." Section 1, "Definition of Force Majeure Conditions," states in relevant part:
The company, its employees and authorized representatives, or the customer will not be liable for losses or damages when such losses or damages result from any act, omission, or circumstances occasioned by or in consequence of any acts of God, strikes, lockouts, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, unforeseeable or unusual weather conditions, washouts, arrests and restraint of rulers and peoples, civil disturbances, explosions, breakage or accident to machinery or lines of pipe, line freeze-ups, temporary failure of gas supply, the binding order of any court or governmental authority, and any other cause, whether of the kind herein enumerated or otherwise, and whether caused or occasioned by or happening on account of the act or omission of the company or any other party, if the cause is not reasonably within the control of the party asserting force majeure and which by the exercise of due diligence such party is unable to prevent or overcome.
Section 2, "Notice of Force Majeure Conditions," states that:
The party asserting force majeure shall promptly notify all other affected parties. The notice shall describe the basis for the assertion of force majeure, the expected duration, and the steps the party expects to take to remedy the force majeure. The *1178 cause of the force majeure event shall, to the extent possible, be remedied with all reasonable diligence.
Rule 14 of the Tariff; CP at 203.
Citoli argues that Rule 14, not Rule 12, is applicable to this case. Rule 14 absolves Puget Sound Energy from liability for interruptions in service caused by "civil disturbances" and a laundry list of other circumstances beyond Puget Sound Energy's control. According to Citoli, because this was a "civil disturbance," Puget Sound Energy breached Rule 14 by failing to (1) notify him of the basis for asserting force majeure, (2) the expected duration of interruption of gas service; and (3) the steps Puget Sound Energy would take to eliminate the force majeure. In contrast, Rule 12 prohibits liability for damages where Puget Sound Energy "deems an emergency warrants interruption[.]" Citoli argues that Rule 12 does not apply because there is nothing in the record showing that Puget Sound Energy "deemed" an emergency; rather, it reacted to a police order issued in response to a civil disturbance. Furthermore, even if Rule 12 applies, he contends that there is a factual dispute regarding whether an emergency existed at the time gas service was interrupted.
Puget Sound Energy argues that Rule 12, not Rule 14, applies to this case. Rule 12, it contends, expressly applies to emergency situations, whereas Rule 14 includes some events that are outside of Puget Sound Energy's control, but are clearly not emergencies in and of themselves (such as strikes, lockouts, and binding orders of the court). However, Puget Sound Energy also asks that this court read Rule 12 and Rule 14 together and hold that Rule 14 provides the steps to be taken when force majeure events occur outside of an emergency context, whereas Rule 12 allows Puget Sound Energy to respond immediately when an emergency situation requires immediate disconnection of gas services.
We view this whole controversy over which Rule applies as somewhat silly. It would be short sighted to rule that Rule 14 only applies outside the emergency context when the rule itself clearly refers to earthquakes, wars, fires, floods, insurrections and other emergency situations. Rule 12 simply states that when gas service must be interrupted for the purpose of making necessary alterations or repairs, the company will give customers reasonable advance notice and will endeavor to arrange such interruptions so as to inconvenience customers as little as possibleunless an emergency requires immediate shutdown without noticeand in either event, such interruptions do not constitute a breach of contract. Rule 14 obviously applies to the interruption of gas service in this case. The takeover of the building at 914 Virginia by WTO protestors was a "civil disturbance" that was "not reasonably within the control of" Puget Sound Energy, and which Puget Sound Energy was "unable to prevent or overcome" "by the exercise of due diligence." Moreover, Puget Sound Energy shut off the gas when ordered to do so by "governmental authority." Citoli does not argue that the order was not "binding." He argues instead that Puget Sound Energy should have promptly notified him of why it shut off the gas, and for what expected duration, and of the steps Puget Sound Energy expected to take to remedy the situation, as provided in Section 2 of Rule 14.
Utilities must file tariff schedules with the Washington Utilities and Transportation Commission (WUTC) showing "all forms of contract or agreement, all rules and regulations relating to rates, charges or service, used or to be used, and all general privileges and facilities granted or allowed" by the gas company. RCW 80.28.050. A filed tariff has the force and effect of law. General Tel. Co. of N.W., Inc. v. City of Bothell, 105 Wash.2d 579, 585, 716 P.2d 879 (1986). "[S]tandard principles of statutory construction apply to the interpretation of the tariff." National Union Ins. Co. v. Puget Sound Power & Light Co., 94 Wash.App. 163, 171, 972 P.2d 481 (1999). When the tariff language "is plain and unambiguous, its meaning must be derived from the words themselves without judicial construction or interpretation." Id. If the tariff language is ambiguousi.e., susceptible to more than one meaningits interpretation is an issue of law to be decided by the court. Id. In that case, the court's role is to "look to the public *1179 utilities statutory and regulatory scheme as a whole to ascertain the WUTC's intent" in approving the tariff. Id. at 173, 972 P.2d 481.
We readily agree with Citoli that Puget Sound Energy should have promptly notified him, as provided in Section 2 of Rule 14, that it had shut off his gas because police ordered it to do so after WTO protestors took over the building, that it expected Citoli would be without gas service for as long as the protestors occupied the building, and that it expected to remedy the situation by restoring gas service as soon as it was notified that the protestors had vacated the buildingin that no matter how much "due diligence" Puget Sound Energy might exercise, it could do nothing to remove the protestors itself. But Rule 14 provides that Puget Sound Energy will not be liable for losses or damages arising from force majeure. It does not provide that failure to give notice as required by Section 2 will make the company liable for damages arising from force majeure. Moreover, Citoli cannot show any damages flowing from the failure of Puget Sound Energy to provide him with notice of what he learned for himself when he arrived at his place of business at 8:30 a.m. on Monday, November 29his gas service had been shut off because WTO protestors had taken over the second and third floors of the building, the service would not be restored as long as the protestors remained in the building, and the service would be restored once the protestors vacated the building. We conclude that Puget Sound Energy's failure to give notice to Citoli as required by Section 2 of Rule 14 technically violated Section 2 of the Rule, but this does not make the company liable for losses or damages arising from the force majeure, and does not entitle Citoli to damages.
Citoli also claims that Puget Sound Energy violated WAC 480-90-148, which requires Puget Sound Energy to "make all reasonable efforts to avoid interruption of service and, if an interruption occurs, must endeavor to reestablish service with the shortest possible delay." The record indicates that Puget Sound Energy did nothing until Monday morning, December 6, 1999, when it received a request from an unidentified caller to restore natural gas service to the premises. This was 2 or 3 days after the protestors left the building. But there is no indication in the record that Puget Sound Energy was notified any sooner than Monday morning that the protestors had indeed vacated the building. Once so notified, Puget Sound Energy promptly restored the gas service.
Our decision in National Union does not change the result. In that case, the continuity-of-service tariff absolved Puget Power from liability for power interruptions where the cause was "beyond the Company's reasonable control." National Union, 94 Wash. App. at 168-69, 972 P.2d 481. After a windstorm knocked out power, Puget Power inexplicably failed to fire up two large backup generators. Id. National Union alleged that the tariff did not absolve Puget Power from liability for interruptions caused concurrently by a windstorm and its own negligence in failing to fire up the generators. Id. at 169, 972 P.2d 481. We held that the tariff absolved Puget Power from liability only for circumstances beyond its control, but not from its alleged negligent failure to activate the backup generators. Id.
We find nothing explicit in Rule 14 or WAC 480-90-148 that would require Puget Sound Energy to monitor the building so as to ascertain when the last of the protestors left. But even if such a duty could be implied from the Rule or the regulation, Citoli has not shown how termination of natural gas service or failure to restore the service sooner than the morning of the first business day following the departure of the protestors caused him any damages. Presumably, the gas was used as a source of heat and hot water for the business. Citoli has not explained how the lack of heat or hot water damaged his business or caused him any personal injury. Without showing damages, there can be no claim.
5. Wrongful Interference with Business Relationships
Citoli next argues that the City Defendants and Puget Sound Energy are liable to him for the tort of wrongful interference with a business relationship. This tort *1180 requires the following elements: (1) a valid contractual relationship or business expectancy, (2) knowledge of that relationship by the defendants, (3) intentional interference by the defendants inducing or causing a breach or termination of the relationship or expectancy, (4) interference by the defendants based on an improper purpose or improper means, and (5) damages. Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 28, 829 P.2d 765 (1992).
Citoli has not shown that the City Defendants intentionally interfered with his business relationships based on an improper purpose of harming him. The damage to Citoli's business was incidental to the unfortunate events surrounding the WTO Conference, specifically, the unlawful takeover of the building by a large number of WTO protestors. Neither has Citoli shown the use of improper means by any of the defendants. Puget Sound Energy and Seattle City Light shut off the utilities pursuant to police order. They did not have a duty to defy the order and turn the utilities back on, nor, in the case of Seattle City Light, to negotiate with the police regarding the possibility of restoring power to the first floor. As we shall discuss in the next section of this opinion, the police did not have a duty to forcibly evict the protestors; they retained the discretion to employ peaceable tactics in managing the standoff, including termination of utilities. All the defendants acted with public safety foremost in mind.
Citoli was terribly wronged during the WTO civil disturbances, but he was not wronged by the defendants. He was wronged by the protestors who unlawfully took over the building where Citoli's business was located, and remained there unlawfully for nearly a week.
6. Section 1983 Claim
Citoli argues next that the City Defendants and Puget Sound Energy violated his civil rights as protected by 42 U.S.C. § 1983. According to Citoli, the City Defendants and Puget Sound Energy deprived him of his right to conduct business by terminating his utilities while allowing known trespassers to remain for the purpose of offering them a place to sleep and to give the police a tactical edge. Citoli argues that these actions constituted a taking of his property without due process of law.
42 U.S.C. § 1983 provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]
42 U.S.C. § 1983 "is not itself a source of substantive rights," but rather provides "a method of vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). To maintain a § 1983 claim, a plaintiff must establish two essential elements: (1) that some person deprived him of a federal constitutional or statutory right; and (2) that the person was acting under color of law. Sintra, 119 Wash.2d at 11, 829 P.2d 765. A § 1983 claim may be established "by direct participation or by setting in motion a series of events which the actor should reasonably know would cause another to suffer a constitutional injury." Morinaga v. Vue, 85 Wash.App. 822, 834, 935 P.2d 637 (1997).
The federal and state constitutions require compensation when private property is taken or damaged for public use. U.S. Const., Fifth Amend., Const. art. I, § 16. A taking occurs when the government invades or interferes with the use or enjoyment of property, and the market value declines as a result. Gaines v. Pierce County, 66 Wash.App. 715, 725, 834 P.2d 631 (1992). "`The term "inverse condemnation" is used to describe an action alleging a governmental "taking" brought "to recover the value of property which has been appropriated in fact, but with no formal exercise of the power." `"Bodin v. City of Stanwood, 79 Wash. App. 313, 320, 901 P.2d 1065 (1995), aff'd, 130 Wash.2d 726, 927 P.2d 240 (1996), quoting Lambier v. City of Kennewick, 56 Wash.App. 275, 279, 783 P.2d 596 (1989). "An inverse condemnation plaintiff must prove a `taking' *1181 greater than `mere tortious interference.'" Id., quoting Gaines at 725, 834 P.2d 631. A taking does not exist unless an invasion causes damage properly characterized as permanent, or recurring, or chronic and unreasonable. Id.
We note that there was no actual physical invasion of Citoli's business premises by any of the defendants, or, for that matter, by any of the protestors. Under a proximate cause theory, it is certainly arguable that terminating the utilities, particularly the electricity, and keeping them off during the standoff, ultimately caused Citoli to lose businessfor purposes of summary judgment, we presume this to be the case. However, the police did not forbid Citoli from entering his business; apparently they allowed him to come and go as he pleased, which he courageously did in spite of his fear of injury by the protestors. Citoli said that he stayed there 9 to 10 hours each day, using battery operated lights and a generator. The lack of electricity and gas likely made things difficult and uncomfortable, but Citoli has not shown that an uninterrupted flow of electricity or gas service during a civil disturbance is a property right. Indeed, Seattle ordinances and state tariffs provide to the contrary. Furthermore, although the presence of protestors on the second and third floors was undoubtedly unnerving, they did not physically invade his business. Citoli has not explained how he can have a property right in keeping trespassers out of adjacent floors of the building.
Courts are reluctant to find that a compensable taking occurred where the government temporarily used or destroyed property in times of emergency. See, e.g., National Bd. of Young Men's Christian Ass'ns v. United States, 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969) (no compensable taking where military troops entered three buildings being looted by a mob of rioters in Panama Canal Zone, ejected the rioters, and took shelter inside the buildings when mob began assaulting the soldiers with sniper fire; some of the buildings were eventually damaged or destroyed in fires started by mob throwing Molotov cocktails at the soldiers); United States v. Caltex (Philippines), Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952) (no compensable taking where United States military destroyed fuel and demolished fuel terminals to keep them from falling into hands of enemy as Japanese troops were entering Manila following attack on Pearl Harbor and subsequent invasion of Philippines during World War II). These cases are not directly on point, because they involved actual destruction or physical invasion of private property during riots or war, rather than mere termination of utilities. However, the basic principle applies: Where the necessities of war or civil disturbance require the destruction or injury of private property, the resulting losses must be borne by the owners of the property, in that the safety of the state in such cases overrides all considerations of private loss. Caltex, 344 U.S. at 154, 73 S.Ct. 200, citing United States v. Pacific R.R. Co., 120 U.S. 227, 234, 7 S.Ct. 490, 30 L.Ed. 634 (1887) (a case involving destruction of bridges owned by railroad company by Northern Army during Civil War to impede the advance of the Confederate Army).
Puget Sound Energy relies on Cougar Bus. Owners Ass'n v. State, 97 Wash.2d 466, 647 P.2d 481 (1982) for the proposition that the Seattle Police Department's order to disconnect gas service during an emergency situation was a proper exercise of its police powers, and that Puget Sound Energy's compliance with the order did not constitute a taking. Cougar Business Owners Association involved an alleged taking without compensation before and after the eruption of Mt. St. Helens. The Governor issued an executive order creating restricted zones around the mountain. The town of Cougar was included in one of the zones. Id. at 467-68, 647 P.2d 481. The Cougar Business Owners Association brought a takings-based § 1983 claim against the Governor, asserting that she included the town of Cougar in the zone too early and failed to remove it promptly enough. Id. at 467, 647 P.2d 481. The court noted that "[i]t is a well established principle that if a regulation is a valid exercise of the State's police powers, it does not constitute a taking." Id. at 476, 647 P.2d 481. The court enumerated the statutes delegating *1182 legislative police powers to the Governor in times of emergency, and narrowed the issue to "whether the restrictions imposed by the Governor were a valid exercise of police powers." Id. at 477, 647 P.2d 481. The court held that the Governor was not liable for a taking without compensation under § 1983 because the restrictions were a valid exercise of police powers in that the actions were taken for the purpose of public safety, were reasonably necessary to public safety, and were not exercised arbitrarily; thus, the business owners in the town of Cougar were not deprived of property without due process of law. Id. at 477-79, 647 P.2d 481. In so holding, the court stated, "Furthermore, an exercise of police power is presumed constitutionally valid. The exercise of police power will be upheld if any state of facts either known or which could be reasonably assumed affords support for it." Id. at 478, 647 P.2d 481 (citations omitted).
Cougar Business Owners Association involved the reasonableness of an executive order issued pursuant to the Governor's statutory authority to invoke police powers to protect the life, health, or property of the general public. Similar principles apply here. Police acted reasonably to protect the life, health, and property of the public in shutting down utilities and declining to forcibly remove the trespassers at the risk of an inferno and injuries to police and protestors alike. The record does not support Citoli's contention that the police intended to offer the protestors a place to sleep. Rather, the police initially (albeit erroneously) believed the protestors would be gone by Wednesday, and decided not to attempt a forcible entry, given the danger of fire or serious injury and the fact that police resources were stretched thin. Moreover, although Citoli contends that the police should have elected to forcibly eject the protestors rather than to wait them out:
If courts were required to consider whether the military or police protection afforded a particular property owner was "adequate," they would be required to make judgments which are best left to officials directly responsible to the electorate. In the present case, for example, petitioners could argue that it was possible for the troops to maintain their position in front of the buildings if they had been willing to kill a large number of rioters. In rebuttal, the Government could persuasively argue that the indiscriminate use of deadly force would have enraged the mob still further and would have increased the likelihood of future disturbances. Which strategy is a court to accept? Clearly, it is far sounder to defer to the other duly constituted branches of government in this regard.
National Bd. of Young Men's Christian Ass'ns, 395 U.S. at 95-96, 89 S.Ct. 1511 (Harlan, J., concurring in the result). By asking us to rule that a taking without just compensation took place because police elected to terminate utilities to the building and wait the protestors out, rather than to forcibly remove them, Citoli effectively asks us to substitute either his judgment or our judgment for that of trained police officers on the best way to handle a building takeover situation. This we decline to do.
The second question is whether the parties were acting under color of state law. The analysis on this issue differs according to whether the "person" accused of violating constitutional rights is a public official, a municipality, or a private entity. A public employee acting in his or her official capacity generally acts under color of state law. Morinaga, 85 Wash.App. at 834, 935 P.2d 637. However, "[p]ersonal participation in the alleged violation is an essential allegation in a § 1983 claim." Hannum v. Friedt, 88 Wash.App. 881, 890, 947 P.2d 760 (1997). The record shows that former Mayor Schell and former Police Chief Stamper were informed of the situation at 914 Virginia, but there is nothing in the record indicating that they personally participated in any way. Furthermore, Mayor Schell and Chief Stamper are entitled to qualified immunity unless Citoli (1) identifies the right violated, (2) shows that the officials should have known the constitutional parameters of the violation, and (3) shows that the official could not have believed the conduct was lawful. Altshuler v. City of Seattle, 63 Wash.App. 389, 394, 819 P.2d 393 (1991). Mayor Schell and Chief Stamper could reasonably have believed the police actions were lawfulindeed, *1183 we have concluded that the actions were lawful.
Citoli argues that the City acted under color of law because the police acted pursuant to RCW 10.31.100[6] in failing to forcibly remove the protestors and because the termination of utilities was an established police procedure in situations of this kind. A local government is a "person" for purposes of § 1983. Hontz v. State, 105 Wash.2d 302, 310, 714 P.2d 1176 (1986). "A municipality can be sued directly if the unconstitutional act `implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" Baldwin v. City of Seattle, 55 Wash.App. 241, 248, 776 P.2d 1377 (1989), quoting Monell v. Department of Soc. Serv., 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). This rule also applies to governmental "custom" even if it has not received formal approval through the body's official decisionmaking channels. Id. To establish a § 1983 claim against a municipality, a plaintiff must (1) identify a specific policy or custom; (2) demonstrate that the policy was sanctioned by the official or officials responsible for making policy in that area of the city's business; (3) demonstrate a constitutional deprivation; and (4) establish a causal connection between the custom or policy and the deprivation. Id. Lack of proof on any of these elements mandates dismissal of the action. Id.
Here, police supervisory officials repeatedly testified that it is standard procedure to shut off utilities in a building takeover situation, and it is clear from their positions of authority and the nature of their testimony that they approved the policy. Thus, Citoli has established a specific policy or custom, and he has demonstrated that the policy was sanctioned by the officials responsible for making policy in that area of the city's business. He has also established a causal connection between the custom or policy and the deprivation of an alleged constitutional right, that is, he has presented evidence from which a rational trier of fact could conclude that he ultimately lost his business because it could not survive his inability to fully service his customers during the weeklong occupation of the building by protestors. His claim nevertheless fails, because he cannot demonstrate a constitutional deprivation, that is, he cannot establish a taking where police reasonably responded to the protestors' takeover of the building where he operated his business by ordering that utility services to the building be shut down. Neither can he demonstrate a constitutional right to a continuous flow of utilities so as to continue to operate his business during a civil disturbance where protestors have taken over the building where the business is located. And finally, he cannot establish a constitutional right to forcible removal by police of 75 to 250 protestors from the building where forcible removal posed a danger to life and property and police resources were already stretched to the limit and beyond, due to the overall nature of the WTO protests going on all over the downtown area.
Citoli also argues that Seattle City Light acted under color of law because it terminated utilities pursuant to Seattle Municipal Code Chapter 21.49. Seattle City Light did act pursuant to ordinance in obeying police orders to shut off the electricity. However, Seattle City Light is not a governing body. It was the City of Seattle, not Seattle City Light, which adopted and promulgated the ordinances at issue. Furthermore, Seattle City Light did not unilaterally decide to terminate utilities; it followed a police order.
Citoli argues that Puget Sound Energy acted under color of state law by terminating gas service, even though it is a private entity. This argument is not persuasive. There is a presumption that private conduct does not constitute government action; "something more" must be present. Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 838 (9th Cir.1999). Courts have used four factors in deciding whether *1184 "something more" is there: (1) public function, (2) joint action, (3) governmental compulsion or coercion, and (4) governmental nexus. Id. Without some other nexus between the private entity and the government, a private party should not be held liable where the State compels it to commit an unconstitutional action. Id. at 838. A private party may act under color of state law when it engages in a conspiracy or acts in concert with state agents to deprive one of his constitutional rights. Fonda v. Gray, 707 F.2d 435, 437 (9th Cir.1983). Puget Sound Energy merely followed the police order to terminate gas services. There is no evidence that it acted in concert or as part of a conspiracy with the police.
In sum, Citoli's § 1983 action fails as a matter of law, as against all the defendants.
7. Tort of Outrage
Last, Citoli argues that Puget Sound Energy and the City Defendants are liable for the tort of outrage. This tort requires: (1) outrageous and extreme conduct by the defendant; (2) the defendant's intentional or reckless disregard of the probability of causing emotional distress; and (3) actual result to the plaintiff of severe emotional distress. Commodore v. University Mech. Contractors, Inc., 120 Wash.2d 120, 135, 839 P.2d 314 (1992). Liability exists "`only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in the civilized community.'" Grimsby v. Samson, 85 Wash.2d 52, 59, 530 P.2d 291 (1975), quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d (1965). Although the question of whether conduct is sufficiently outrageous is ordinarily a question for the trier of fact, the court must first determine whether "reasonable minds could differ on whether the conduct has been sufficiently extreme and outrageous to result in liability." Spurrell v. Bloch, 40 Wash.App. 854, 862, 701 P.2d 529 (1985).
Viewing the facts in the light most favorable to Citoli, he has not met this standard. Seattle City Light and Puget Sound Energy behaved properly, not outrageously, in following the police order to terminate utilities. And the police made a reasonable decision, not an outrageous one, in choosing to follow standard procedures in dealing with building takeover situations by shutting off utilities and waiting the protestors out, rather than forcibly evicting them in the face of a high risk of danger to life and property if forcible eviction were attempted.
We conclude that the trial court properly granted summary judgment to all defendants. Affirmed.
AGID, J., and SCHINDLER, J., concur.
NOTES
[1] This building is sometimes referred to as "The Kalberer Hotel." Clerk's Papers at 132.
[2] In his motion for reconsideration, Citoli argued for the first time in a separate cause of action that a City work-release crew used mops and buckets of water to clean the second and third floors of the building, negligently flooding his business and causing further damages. Citoli subsequently voluntarily dismissed this claim, and it is not before us in this appeal.
[3] Seattle City Light does not dispute that there was a valid and enforceable contract with Citoli to provide electrical service, as evidenced by rules governing Seattle City Light in the Seattle Municipal Code. SMC 21.49.100(B).
[4] WAC 480-100-076 has been repealed, effective June 3, 2001.
[5] Citoli's briefing is not crystal clear. He may also be arguing that the police themselves were negligent in electing to shut off utilities in the hope that the protestors would leave the building on their own, as an alternative to forcibly ejecting them. If this is indeed Citoli's claim, he provides no legal analysis or authority for the proposition. Nevertheless, the City Defendants argue vigorously that they are shielded from liability for negligence by the public duty doctrine, and Citoli argues vigorously that they are not shielded by the public duty doctrine because one or more of the exceptions applies. The public duty doctrine is "viewed as a mechanism for focusing attention on whether the governmental agency owed a duty to the particular plaintiff, rather than the public as a whole." Bailey v. Forks. 108 Wash.2d 262, 267, 737 P.2d 1257 (1987). But where general tort principles bar a lawsuit, courts need not address the public duty doctrine. Id. at 266-67, 737 P.2d 1257. Citoli's negligence claim against Seattle City Light fails as a matter of law, under general tort principles. Any negligence claim he may have intended to raise against the city, the police chief or the mayor fail for lack of adequate legal analysis and citation to authority. For these reasons, we decline to address the public duty doctrine.
[6] RCW 10.31.100 addresses police authority to make warrantless arrests, but does not mandate such arrests.