[No. 47885-6.   En Banc.   June 10, 1982.]

COUGAR BUSINESS OWNERS ASSOCIATION, ET AL, *Appellants*, v. THE STATE OF WASHINGTON, ET AL, *Respondents*.

*Odine H. Husemoen* (of *Walstead, Mertsching, Husemoen, Donaldson & Barlow*) and *Robert W. Huffhines, Jr.*, for appellants.

*Kenneth O. Eikenberry, Attorney General, Joseph S. Montecucco, Senior Assistant,* and *Mary Ann Condon, Assistant,* for respondent State.

DIMMICK, J.—Appellants, members of an association of business owners in the town of Cougar, brought this suit against the State of Washington, Governor Ray and two unnamed individuals based upon the state of emergency declared in April 1980 due to the volcanic activity of Mount St. Helens. Appellants allege damages caused by the Governor's declaring the emergency too soon, including Cougar in the restricted "red zone", and failing to remove Cougar from that zone soon enough. The trial court granted respondents' motion for summary judgment dismissing appellants' complaint. We affirm.

The issue is whether appellants' damage suit is a proper mode to assail the respondents' actions in declaring a state of emergency and imposing restrictions. We conclude that respondents' actions were discretionary and lawful and not subject to a collateral attack by a suit for damages brought months after the questioned efforts were made.

The town of Cougar is located near the north end of Yale Lake, approximately 11 miles southwest of Mount St. Helens. In March 1980, a series of earthquakes occurred under the mountain. The following relevant events then took place:

Mar. 27 Mountain erupted spewing steam and ash with intermittent eruptions through April and May.

Apr. 3 Declaration by the Governor. Declared an emergency in the state pursuant to RCW 43.06.210 and 38.08.040 caused by the volcanic activity of Mount St. Helens.

Apr. 30 Executive Order 80–05. Created two restricted zones around the mountain informally known as the red and blue zones to which access was restricted to official government, law enforcement, scientific, search and rescue activity.

May 18 Major eruption causing substantial destruction and loss of human life.

May 25 Executive Order 80–08. Amended previous order extending the red zone from the center of Mount St. Helens to a radius of 20 miles surrounding the mountain and restricting access to government, scientific, law enforcement, search and rescue activities, the news media, and individual property owners and persons with business within the zone and others by special permit.

May 25 Eruption of steam, ash, pyroclastic flow, pumice and mud flows.

June 2 Executive Order 80–09. Amended Executive Order 80–08 by defining exact boundaries of the red zone and further clarifying the access through permit process requiring those who were exempted from the access restrictions to obtain permits. Persons owning property and having legitimate business reasons for being within the red zone were allowed admission

upon obtaining an identification permit.

June 12,
July 22    Eruption of steam, ash, pyroclastic flow, pumice and mud flows.

July 29    Executive Order 80–11. Amended Executive Order 80–09 by moving the red zone slightly northward on the south side of the mountain to allow access of the public to the Lake Merwin area and the communities of Yale, Aerial and Woodland Park. Other minor adjustments were made to the boundary (not relevant herein).

Aug. 7,
Aug. 15    Eruption of steam, ash, pyroclastic flow, pumice and mud flows.

Sept. 3    Cougar hearing panel appointed. Governor appointed Cougar hearing panel to conduct a public hearing on the question of whether the Cougar area and a corridor leading to it should be removed from the red zone.

Sept. 11    Public hearing. The Cougar hearing panel conducted public hearing at the Yale school and subsequently recommended that the area of Cougar and the corridor leading to it be removed from the red zone.

Oct. 1    Executive Order 80–15. Removed Cougar and its primary access route from the red zone.

Throughout this period the Governor consulted with several scientific experts including Dr. Dwight R. Crandell, a geologist for the United States Geological Service. She established a Mount St. Helens watch group composed of directors of Agriculture, Ecology, Office of Financial Management, State Patrol, Transportation, Social and Health Services, Emergency Services, and the National Guard. The group was created to keep the Governor informed and to assist in developing plans to meet the needs of the situation.

The Governor filed an affidavit with the trial court stat-

ing that the unpredictable nature of the volcano created a statewide threat to life and property when she issued the declaration of emergency in April. Upon the advice of experts she imposed the restricted zones. The eruption on May 18 was greater than predictions had indicated. The Governor subsequently determined that it was necessary to extend the restricted areas due to the increased danger. She took such action because her information indicated that it was unknown whether subsequent explosive eruptions of equivalent or greater magnitude than the eruption on May 18 would occur. There was a distinct possibility that a pyroclastic flow from such a blast could reach the Cougar area. The Governor expressly stated:

> As the summer progressed I was aware of the concern of some elements of the business people in Cougar that the restricted entry to their area was depressing their economy. I was also being advised of the continuing hazard to the Cougar area that the mountain posed. In making my judgments I weighed opinions both for and against opening access to Cougar.
>
> . . .
>
> In each of these decisions affecting the Town of Cougar and its residents I weighed the advice of federal, state and local officials as well as the scientific community and made my decision exercising my best judgment based on the then current state of information and opinion. I acted at all times out of regard for what in my considered judgment was necessary to preserve and maintain life, health, property and the public peace. I acted at all times in good faith and without malice toward any person. Throughout this period of time it was my firm belief that the Mt. St. Helens disaster created the need for a continuing state of emergency necessitating in certain areas of this state at certain times restrictions on access such as those imposed by me on the Cougar Area.

On October 31 appellants filed the instant action alleging the State's actions were tortious and constituted a taking of property without compensation in violation of the federal and state constitutions. Furthermore, they alleged they were entitled to damages under 42 U.S.C. § 1983. We conclude that Governor Ray's actions were authorized by stat-

ute and were entirely discretionary. Accordingly, appellants' tort claims must fail. In addition, her actions were proper exercises of her police power and thus did not constitute a taking of property without just compensation. The Governor, under these circumstances, is not liable under 42 U.S.C. § 1983. Our holding does not leave the residents of this state without redress in similar situations. Appellants may have challenged the actions by using an extraordinary writ at an earlier stage. They chose, however, to wait and when subsequent eruptions of the magnitude of the May 18 eruption did not recur, decided to seek recovery for damages.

Appellants contend that respondents' actions in including Cougar in the restricted zone and not removing it soon enough constituted a nuisance, a trespass, and an intentional interference with business expectancies. These allegations were brought pursuant to RCW 4.92.090, which provides that the State is liable for tortious conduct to the same extent as private individuals. In interpreting that statute we held that truly discretionary governmental acts on an executive level could not be characterized as tortious and thus could not be cognizable under the statute. *Evangelical United Brethren Church v. State*, 67 Wn.2d 246, 253–55, 407 P.2d 440 (1965). We set forth a 4-part test for determining whether an action is truly discretionary:

> (1) Does the challenged act . . . necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act . . . essential to the realization or accomplishment of that policy, program, or objective . . .? (3) Does the act . . . require the exercise of basic policy evaluation, judgment, and expertise . . .? (4) Does the governmental agency involved possess the requisite constitutional, [or] statutory . . . authority . . . to do or make the challenged act . . .?

*Id.*, at 255. If all four questions can be clearly and unequivocally answered in the affirmative, then the act or decision can be classified as a discretionary governmental function and nontortious.

We subsequently reaffirmed *Evangelical* and refined the

process of determining discretionary decisions by requiring that the State make a showing that a "policy decision, consciously balancing risks and advantages, took place." *King v. Seattle,* 84 Wn.2d 239, 246, 525 P.2d 228 (1974).

Criteria for characterizing an action as discretionary are met in the instant case. First, in an area affected by a natural disaster the preservation and maintenance of life, health, property and the public peace is a basic governmental policy. Second, in the case of a volcano, such as Mount St. Helens, the establishment of a restricted zone of entry around the mountain during a period of uncertain eruptions is essential to the realization and accomplishment of that policy. Third, the decision of whether a particular area or town should be included within the restricted access zone requires the exercise of basic policy evaluation, judgment and expertise. Fourth, the Governor possesses the requisite constitutional and statutory authority to restrict access to certain localities for the protection of the public. Finally, the Governor made a conscious decision to include the Town of Cougar within the area of the red zone because of her concern that it was exposed to danger from Mount St. Helens.

The only requisite factor appellants challenge as missing is the fourth factor in the *Evangelical* test. That is, appellants contend that the Governor lacked the constitutional and statutory authority to act as she did. We disagree.

The Constitution of the State of Washington imposes on the Governor the duty to see that the laws are faithfully executed. Const. art. 3, § 5.

RCW 43.06.010 prescribes the general powers and duties of the Governor, including:

(12) The governor may, after finding that a public disorder, disaster, energy emergency, or riot exists within this state or any part thereof which affects life, health, property, or the public peace, proclaim a state of emergency in the area affected, and the powers granted the governor during a state of emergency shall be effective only within the area described in the proclamation;

RCW 43.06.200 defines a "state of emergency" as an emergency proclaimed as such by the Governor pursuant to RCW 43.06.010. RCW 43.06.210 provides for the issuance of a proclamation of emergency and executive orders:

The proclamation of a state of emergency and other proclamations or orders issued by the governor pursuant to RCW 43.06.010, and 43.06.200 through 43.06.270 as now or hereafter amended shall be in writing and shall be signed by the governor and shall then be filed with the secretary of state. The governor shall give as much public notice as practical through the news media of the issuance of proclamations or orders pursuant to RCW 43.06-.010, and 43.06.200 through 43.06.270 as now or hereafter amended. The state of emergency shall cease to exist upon the issuance of a proclamation of the governor declaring its termination: *Provided,* That the governor must terminate said state of emergency proclamation when order has been restored in the area affected.

RCW 43.06.220 sets forth the powers of the Governor after proclaiming a state of emergency and provides in pertinent part:

The governor after proclaiming a state of emergency and prior to terminating such, may, in the area described by the proclamation issue an order prohibiting:

. . .

(8) The use of certain streets, highways or public ways by the public; and

(9) Such other activities as he reasonably believes should be prohibited to help preserve and maintain life, health, property or the public peace.

In imposing the restrictions provided for by RCW 43.06.010, and 43.06.200 through 43.06.270, the governor may impose them for such times, upon such conditions, with such exceptions and in such areas of this state he from time to time deems necessary.

Under the emergency services act, RCW 38.52, the Legislature has declared the following policy and purpose:

(1) Because of the existing and increasing possibility of the occurrence of disasters of unprecedented size and destructiveness resulting from . . . natural causes, and in order to insure that preparations of this state will be adequate to deal with such disasters, to insure the

administration of state and federal programs providing disaster relief to individuals, and further to insure adequate support for search and rescue operations, and generally to provide for the common defense and to protect the public peace, health, and safety, and to preserve the lives and property of the people of the state, it is hereby found and declared to be necessary:

. . .

(b) To confer upon the governor and upon the executive heads of the political subdivisions of the state the emergency powers provided herein;

RCW 38.52.020(1). The act goes on to define the Governor's general powers and duties, including:

(3) In performing his duties under this chapter and to effect its policy and purpose, the governor is further authorized and empowered:

(a) To make, amend, and rescind the necessary orders, rules, and regulations to carry out the provisions of this chapter within the limits of the authority conferred upon him herein . . .

RCW 38.52.050(3).

RCW 38.08 provides for the exercise of the Governor's military powers. RCW 38.08.040 provides in pertinent part that:

[I]n event of public disaster, the governor shall have power to order the organized militia of Washington, or any part thereof, into active service of the state to execute the laws, and to perform such duty as he shall deem proper.

RCW 38.08.060 provides in pertinent part:

Whenever any portion of the militia is ordered to duty by the governor, the decision of the governor shall be final, incontrovertible, and unimpeachable.

These statutory powers evidence a clear intent by the Legislature to delegate requisite police power to the Governor in times of emergency. The necessity for such delegation is readily apparent:

In times of natural catastrophe or civil disorder, immediate and decisive action by some component of state government is essential. The legislative police

power can of course be exercised to deal with crises affecting the public health, safety, and welfare. In practice, however, the ravages of nature and the exigencies of rioting, labor strife, and civil rights emergencies usually necessitate prompt governmental response. Since the executive is inherently better able than the legislature to provide this immediate response, state chief executives have frequently been given substantial discretionary authority in the form of emergency powers to deal with anticipated crises. Consequently, when public emergencies arise, the center of governmental response is usually the governor's office.

(Footnote omitted.) Comment, *Constitutional and Statutory Bases of Governors' Emergency Powers,* 64 Mich. L. Rev. 290, 290 (1956).

Appellants concede that in the event of a disaster a Governor has the requisite emergency powers to take the actions Governor Ray took in response to the Mount St. Helens eruption. They contend a disaster is a specifically definable event causing harm or injury, that there was no such "disaster" until May 18, thus the proclamation of emergency prior to May 18 and the executive orders issued pursuant thereto were void.

■■ This definition of "disaster" is unduly narrow and restricts the legislative intent to empower the Governor to respond to emergencies. In this case the disaster was not only the eruption of May 18 but was in fact the reactivation of a dormant volcano. If appellants' definition of "disaster" is accepted, only an actual pyroclastic eruption of the volcano constituted a disaster. The Governor's apparently broad emergency powers would be limited to clean–up operations. The Governor would have had no power to act before the actual eruption to save lives or property. In other words, nothing of a preventive nature could have been done. Such a contention is contrary to the legislative intent of the statutes upon which the Governor's actions were based.

Appellants also argue that the Governor's actions were outside the purview of the statute due to that portion of

RCW 43.06.210 which provides that the Governor "must terminate said state of emergency proclamation when order has been restored in the area affected." Appellants contend that order was restored in the area surrounding Cougar sometime in June and since the Governor did not remove Cougar from the restricted zone until October she violated the directive of RCW 43.06.210. The statute does not define what the phrase "when order has been restored" means. Logically, it means a time when the "public disorder, disaster, energy emergency, or riot" which led the Governor to declare the state of emergency no longer exists. The Governor's discretion is the same in determining both the start and end of such an occurrence. This is particularly true when the disaster is an active but not currently erupting volcano.

In summary, appellants brought this action pursuant to RCW 4.92.090. Under that statute discretionary decisions are immune from liability. The proclamation of an emergency and the Governor's issuance of executive orders restricting access to a particular locality are by statute committed to the sole discretion of the Governor and not amenable to review in a civil action for damages.

Appellants also allege that the inclusion of Cougar within the restricted area and the continued restrictions of the area until October 1 constituted a taking without just compensation violative of the Fifth Amendment of the United States Constitution and article 1, section 16 of the Washington State Constitution. It is a well established principle that if a regulation is a valid exercise of the State's police powers, it does not constitute a taking. *Goldblatt v. Hempstead,* 369 U.S. 590, 8 L. Ed. 2d 130, 82 S. Ct. 987 (1962); *Mugler v. Kansas,* 123 U.S. 623, 668–69, 31 L. Ed. 205, 8 S. Ct. 273 (1887); *Rains v. Department of Fisheries,* 89 Wn.2d 740, 575 P.2d 1057 (1978); *Maple Leaf Investors, Inc. v. Department of Ecology,* 88 Wn.2d 726, 565 P.2d 1162 (1977).

We have set forth the statutes delegating legislative police powers to the Governor in times of an emergency.

Specifically, RCW 43.06.220(9) grants the Governor power to prohibit activities he or she feels are necessary to protect the life, health or property of the general public. There is no doubt that the restrictions imposed by the Governor were inherently within her police power. In fact, appellants present no argument countering the fact that the Governor imposed the restrictions to protect the public. The question narrows, therefore, to whether the restrictions imposed by the Governor were a valid exercise of police powers.

■ The United States Supreme Court in *Goldblatt v. Hempstead, supra,* enunciated the vague standard applicable in determining the validity of a police power regulation.

> Except for the substitution of the familiar standard of "reasonableness," this Court has generally refrained from announcing any specific criteria. The classic statement of the rule in *Lawton* v. *Steele,* 152 U. S. 133, 137 (1894), is still valid today:
>> "To justify the State in . . . interposing its authority in behalf of the public, it must appear, first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."
> Even this rule is not applied with strict precision, for this Court has often said that "debatable questions as to reasonableness are not for the courts but for the legislature. . . ." *E. g., Sproles* v. *Binford,* 286 U. S. 374, 388 (1932).

369 U.S. at 594–95.

This court has also enunciated a test to be applied in determining the reasonableness of a regulation adopted pursuant to the police power. The test is clearly set forth in *Petstel, Inc. v. County of King,* 77 Wn.2d 144, 154–55, 459 P.2d 937 (1969):

> First, any legislation under the police power must be reasonably necessary in the interest of the public health, safety, morals, and the general welfare. *E.g., Reesman v. State,* 74 Wn.2d 646, 445 P.2d 1004 (1968); *State v. Spino,* [61 Wn.2d 246, 377 P.2d 868 (1963)]; *Clark v. Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960); *Remington Arms Co. v. Skaggs,* [55 Wn.2d 1, 345 P.2d 1085 (1959)].

In applying this test, courts utilize the presumption mentioned earlier—if a state of facts justifying the legislation can be conceived to exist, the existence of these facts will be presumed. This presumption severely limits judicial review at this stage, because in order to fail this first test there must be no reasonably conceivable state of facts creating a public need for regulation.

The second general test requires that even though the activity in question be subject to police power regulation, the legislation must be substantially related to the evil sought to be cured. (This evil may have been presumed under the first test; so that discussions of these two tests in opinions are usually interrelated.) *See e.g., State ex rel. Rhodes v. Cook,* 72 Wn.2d 436, 433 P.2d 677 (1967); *Treffry v. Taylor,* 67 Wn.2d 487, 408 P.2d 269 (1965).

The third test is really an offshoot of the second with some equal protection overtones. It requires that the classes of businesses, products or persons regulated, or the various classes established within the legislation be reasonably related to the legitimate object of the legislation. *See County of Spokane v. Valu–Mart, Inc.,* 69 Wn.2d 712, 419 P.2d 993 (1966).

The fourth test is also a specialized application of the second which is peculiar to rate regulation. It requires that the rates set be reasonable, and not unnecessarily prohibitory and confiscatory. *See People v. Albrecht,* 145 Colo. 202, 358 P.2d 4 (1960).

These four tests represent the limits of judicial review of legislative enactments under the police power. The courts will not examine the motives of the legislative body; they will not require factual justification for the legislation if it can reasonably be presumed; and the courts will not weigh the wisdom of the particular legislation enacted.

Furthermore, an exercise of police power is presumed constitutionally valid. *E.g., Bibb v. Navajo Freight Lines, Inc.,* 359 U.S. 520, 529, 3 L. Ed. 2d 1003, 79 S. Ct. 962 (1959); *Salsburg v. Maryland,* 346 U.S. 545, 553, 98 L. Ed. 281, 74 S. Ct. 280 (1954). The exercise of police power will be upheld if any state of facts either known or which could be reasonably assumed affords support for it. *E.g., Goldblatt v. Hempstead, supra; United States v. Carolene Prods. Co.,* 304 U.S. 144, 154, 82 L. Ed. 1234, 58 S. Ct. 778

(1938).

In applying these tests, we find that the restrictions imposed upon appellants' land by the Governor were valid exercises of her police power. Thus, appellants' complaint was properly dismissed.

Our conclusion that the restrictions imposed by the Governor were proper exercises of her police power is relevant to appellants' final contention that they are entitled to damages under 42 U.S.C. § 1983 because their federal constitutional rights were infringed. Specifically, appellants contend that the restrictions imposed by the Governor deprived them of property rights without due process of law.

█ The general rule is that the State is not deprived of the power to enact regulations reasonable in character by the Fourteenth Amendment, and a restriction which is a valid exercise of the police power does not violate the due process clause of the federal constitution. *See, e.g., Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264, 300, 69 L. Ed. 2d 1, 101 S. Ct. 2352, 2372 (1981); *Carpenters Local 213 v. Ritter's Cafe,* 315 U.S. 722, 86 L. Ed. 1143, 62 S. Ct. 807, *reh'g denied,* 316 U.S. 708 (1942); *Terrace v. Thompson,* 263 U.S. 197, 217, 68 L. Ed. 255, 44 S. Ct. 15 (1923); *Pacific Gas & Elec. Co. v. Police Court,* 251 U.S. 22, 25, 64 L. Ed. 112, 40 S. Ct. 79 (1919); *Barbier v. Connolly,* 113 U.S. 27, 31, 28 L. Ed. 923, 5 S. Ct. 357 (1884). The United States Supreme Court has, in addition, required that governmental regulations shall be accomplished by methods consistent with due process and thus the due process clause is a limitation upon an arbitrary or unreasonable exercise of the power. *See, e.g., Nashville, C. & St. L. Ry. v. Walters,* 294 U.S. 405, 79 L. Ed. 949, 55 S. Ct. 486 (1935); *Nebbia v. New York,* 291 U.S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 A.L.R. 1469 (1934).

Appellants assert that police power exercised herein was unreasonable and thus violated their due process rights. We cannot agree under the circumstances of this case. We previously discussed the judicial test for reasonableness of a

regulation adopted under the state's police power and concluded that the restrictions herein met those standards. Accordingly, the restrictions did not deprive appellants of any property rights without due process of law and appellants' complaint was properly dismissed. We thus need not reach the State's contentions that the Governor was immune from liability under 42 U.S.C. § 1983 pursuant to *Scheuer v. Rhodes,* 416 U.S. 232, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); *Wood v. Strickland,* 420 U.S. 308, 43 L. Ed. 2d 214, 95 S. Ct. 992, *reh'g denied,* 421 U.S. 921 (1975); *Procunier v. Navarette,* 434 U.S. 555, 55 L. Ed. 2d 24, 98 S. Ct. 855 (1978); and *Hocker v. Woody,* 95 Wn.2d 822, 631 P.2d 372 (1981).

In sum, it is obvious that Washington is in the unique and unenviable position of having an active volcano in its midst. The unpredictable volcano presents continuing problems as indicated by Governor Spellman's, Governor Ray's successor, involvement in monitoring the restricted areas around a still active volcano. A cause of action for damages such as that brought by appellants is not the proper mode to challenge the Governor's actions. If it were, a suit could be brought by persons disagreeing with the decisions made contending that Cougar should have been excluded from the restricted zone and other suits contending, at the same time, that Cougar should have been included in the restricted zone earlier. Each damage suit would collaterally attack the Governor's decision and the proper location of the restricted zones would be determined by different courts in different forums.

We affirm the trial court's dismissal of appellants' complaint.

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, UTTER, DOLLIVER, WILLIAMS, DORE, and PEARSON, JJ., concur.