[Nos. 51042-8-I; 51142-4-I; Division One. March 22, 2004.] 51141-6-I.

*In the Matter of the Property Located at 14255 53rd Ave. S., Tukwila, King County, Washington.*

SHEILA JEANNE MALBRAIN, ET AL., *Respondents*, v. THE DEPARTMENT OF AGRICULTURE, *Appellant*.

*In the Matter of the Property Located at 14247 53rd Ave. S., Tukwila, King County, Washington.*

CARL GORGEY, ET AL., *Respondents*, v. THE DEPARTMENT OF AGRICULTURE, *Appellant*.

*In the Matter of the Property Located at 14415 53rd Ave. S., Tukwila, King County, Washington.*

RALPH KISSINGER, ET AL., *as Trustees, Respondents*, v. THE DEPARTMENT OF AGRICULTURE, *Appellant*.

*Christine O. Gregoire, Attorney General,* and *Jerri L. Thomas, Senior Counsel,* and *Alan D. Copsey, Assistant,* for appellant.

*Kurt A. Denke*; and *John M. Groen* (of *Groen Stephens & Klinge, L.L.P.*), for respondents.

BECKER, C.J. — To prevent a widespread infestation by the citrus longhorned beetle, a dangerous pest, the State Department of Agriculture undertook to destroy all potential host trees near a location in Tukwila where five beetles accidentally escaped from quarantine. Litigation arose when several landowners refused to allow their trees to be destroyed unless they first received compensation. Because the Department justifiably took action necessary to avert a public calamity, the takings clause[1] did not require compensation to the owners of the trees. The order requiring the Department to pay compensation is reversed.

Three citrus longhorned beetles were found in a Tukwila nursery in August 2001, in maple tree bonsai stock im-

---

[1] WASH. CONST. art. I, § 16; U.S. CONST. amend. V.

ported from Korea. One beetle was a pregnant female. Because there were eight beetle exit holes on the stock, five beetles had presumably escaped from the quarantine area; in fact, one was seen flying away from the nursery. The discovery of the accidental escape was alarming because the beetle, a major pest of citrus, also feeds on many other species of trees, including apple and other fruit trees as well as alder, willow, oak and some conifers. Eventually the beetle kills all host trees.

Washington's Department of Agriculture, assisted by its federal counterpart, assembled a panel of experts, the "Science Advisory Panel," and posed a series of questions on how best to respond to the exposure. The panel answered that the discovery of the beetles in Tukwila should be viewed as an introduction of the beetle into the area, not just a regulatory incident, and that if effective action were not taken soon, there was a "strong likelihood" that the beetle would become permanently established. An established beetle population could become a severe pest of forest ecosystems, urban and suburban shade trees, and agriculture. Should infestation occur, the threat was not only to Washington, but to the Northwest in general, to California, and to much of the rest of North America. To wait for definite evidence of a reproducing population before initiating control measures would not be prudent because if the beetles were reproducing, after a year they would be virtually uncontainable.

Because of the way in which the beetle burrows into a host tree, its presence is very difficult to detect. The beetle emerges from the tree only upon reaching adulthood. The only truly effective method of eradicating the beetle is by completely destroying the potential host trees. Injecting insecticides into the trees can be a supplemental method of eradication, but it does not achieve high mortality and its effectiveness varies with the species of tree.[2]

---

[2] Clerk's Papers at 43-51: The Science Advisory Panel's answers to questions from the Washington State Department of Agriculture, Oct. 26, 2001.

Based on the panel's report, the Department began to survey all properties within half a mile of the escape site to look for evidence of the beetle and to identify potential host trees. The Department's final eradication plan, the development of which included review under the State Environmental Policy Act, chapter 43.21C RCW, called for removal of all host species trees within a one-eighth mile radius from the escape site, injection of insecticide into suspected host trees out to one-quarter of a mile, and surveillance out to half a mile. The plan to remove trees within a one-eighth mile radius—a distance chosen based on how far the beetle is known to fly upon emerging—affected approximately 32 acres of land and 51 landowners.

Governor Gary Locke proclaimed an emergency in June 2002 and authorized the Department to implement the eradication plan. The Department immediately began to remove trees. The landowners within the one-eighth mile radius found themselves in the predicament that through no fault of their own, their lovely trees had become a threat to the community because of their susceptibility to being commandeered by a noxious pest. The Department established a $100,000 fund for the purchase of replacement trees and other vegetation for yards and gardens, and arranged to supply landowners with vouchers that could be used to obtain various nonhost species of vegetation from participating nurseries.[3] But these efforts to mitigate the effect of the eradication plan fell short of what several landowners regarded as fair. The landowners who are the respondents in the present case took the position that they were constitutionally entitled to just compensation before their trees could be destroyed. Targeted for destruction on land belonging to Sheila Malbrain and Lee Terrell were fruit trees, flowering plums, poplar trees, rose and lilac bushes, azaleas, and fir trees their arborist valued at a total of $116,262. Seven fruit trees on Carl Gorgey's land were valued at $4,430. Six broadleaf trees on land belonging to Ralph and Thelma Kissinger were valued at $17,215.

---

[3] Clerk's Papers at 83.

The Department sought administrative warrants to gain entry to the respondents' properties. The superior court found that the warrants were supported by probable cause. The court made an unchallenged finding that the beetle constituted an "extreme threat to the interests of the state" and that the Department acted reasonably in its response to this threat.[4] The court nevertheless ruled that destruction of the trees was a compensable taking, and conditioned the issuance of the warrants upon the landowners first being compensated.

So that the warrants would issue immediately, the Department negotiated a stipulation with the respondents whereby the Department would be able to appeal "the substantive issues regarding takings and the timing of compensation," but it would not be able to challenge on appeal the amount of compensation as determined by the landowners' arborists.[5] Upon the stipulation being read into the court record, the court issued the warrants, and the Department destroyed the trees.

These facts are undisputed. The Department appeals from conclusions of law supporting the final judgment and order. The essential issue is whether the destruction of the trees to combat the threat of a beetle infestation was a compensable taking.

The United States Constitution guarantees that private property shall not be taken for public use, without just compensation. U.S. CONST. amend. V. The Washington Constitution has a similar guaranty, and states that compensation is to be paid before the taking: "No private property shall be taken or damaged for public or private use without just compensation having been first made, or paid into court for the owner." CONST. art. I, § 16.

---

[4] Clerk's Papers at 227.

[5] Report of Proceedings (July 30, 2002) at 143-44; *see also* Final Judgment, Clerk's Papers at 524 ("The parties' stipulation as to the amounts owed is without prejudice to the right of the Department to contend on appeal that no compensation is owed because no compensable taking has occurred, and enforcement on this judgment is stayed pending the resolution of any appeal.").

■ Not every government action that takes, damages, or destroys property is a taking subject to the constitutional compensation requirement. *Eggleston v. Pierce County*, 148 Wn.2d 760, 768, 64 P.3d 618 (2003) (police, in seizing evidence of a crime, removed load-bearing walls, thus rendering a home uninhabitable; held, the damage claim was not cognizable under state and federal takings clauses). The United States Supreme Court has stated that no set formula exists to determine whether compensation is constitutionally due for a government restriction of property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982). The inquiry is essentially ad hoc and factual, though not standardless. Even a substantial regulation of the use of property may be upheld without making it subject to the compensation requirement of the takings clause upon consideration of various factors set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). *Loretto*, 458 U.S. at 426. But when a physical intrusion by government "reaches the extreme form of a permanent physical occupation," that factor alone is determinative of a taking. *Loretto*, 458 U.S. at 426. A permanent physical occupation "is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine," and as a per se taking will categorically require the payment of compensation. *Loretto*, 458 U.S. at 432. The landowners here contend that the confiscation of their trees was a per se categorical taking under *Loretto*.

The New York statute at issue in *Loretto* required landlords to permit installation of cable wire and boxes on their property to facilitate cable television transmission. *Loretto*, 458 U.S. at 423. In a takings claim by a landlord whose building had been wired by Teleprompter, defendants argued that the statute did not require compensation because it was simply a permissible exercise of the state's police power to regulate the use of real property and the landlord-tenant relationship. The Supreme Court concluded that the

installation of cable in reliance on the statute was a permanent physical occupation of real property, and therefore a compensable taking. The Court did not question a lower court's conclusion that the statute served a legitimate public purpose and was within the state's police power. "It is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid. We conclude that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." *Loretto*, 458 U.S. at 425-26 (citations omitted).

Central to the Court's decision in *Loretto* was the permanently invasive nature of the cable installations. *Loretto*, 458 U.S. at 430. A per se taking occurs only where there is a permanent physical occupation, not where the invasion is temporary or where government action outside the property causes some consequential damage within it. *Loretto*, 458 U.S. at 428. "The permanence and absolute exclusivity of a physical occupation distinguish it from temporary limitations on the right to exclude. Not every physical *invasion* is a taking." *Loretto*, 458 U.S. at 435 n.12. Flooding caused by government construction, for example, will not amount to a taking unless it " 'constitute[s] an actual, permanent invasion of the land, amounting to an appropriation of, and not merely injury to, the property.' " *Loretto*, 458 U.S. at 428 (quoting *Sanguinetti v. United States*, 264 U.S. 146, 149, 44 S. Ct. 264, 68 L. Ed. 608 (1924)). Under *Sanguinetti*, flooding that reduces property to "an irreclaimable bog" is a compensable taking, but compensation need not be paid in a case of intermittent flooding that does not destroy the usefulness of the flooded property. *Sanguinetti*, 264 U.S. at 149-50.

██ ██ The respondents contend that if the permanent physical occupation of such a small amount of space as was needed for the cable boxes and wires in *Loretto* is unquestionably a taking, the permanent and complete confiscation of their trees must a fortiori have been a taking also. But ownership of growing trees is a real property interest, a

part of an estate in land. *Layman v. Ledgett*, 89 Wn.2d 906, 911, 577 P.2d 970 (1978). The trees destroyed by the Department were part of the realty belonging to the respondents. The Department entered upon the respondents' real property in response to an emergency, destroyed the host trees, and left. This action was an injury to their property, but it did not reduce it to an irreclaimable desert. We conclude the destruction of the trees was not a government action that must, under *Loretto*, be seen as "a taking without regard to the public interests that it may serve." *Loretto*, 458 U.S. at 426.

■■ A better fit for these facts is the line of cases applying what is known as the law of necessity or the conflagration doctrine. "It is the law that, in meeting an emergency, such as fire, flood, or pestilence, public officials and private citizens may employ almost any available means in an endeavor to control the danger." *Short v. Pierce County*, 194 Wash. 421, 432, 78 P.2d 610 (1938). Our Supreme Court applied the law of necessity in *Short* to hold that berry farmers on the Puyallup River were not entitled to government compensation for topsoil that had been stripped from their property, bagged, and used in an emergency flood control operation. Only after the emergency situation had abated, and county employees continued to use the farmers' property as a base for constructing permanent flood control structures, did the government become obligated to compensate the farmers for the resulting damage. *Short*, 194 Wash. at 435-36.

Quoting extensively from authorities on the law of necessity, the court in *Short* found that the emergency appropriation of farmers' topsoil was comparable to the destruction of homes to avoid a conflagration, the throwing overboard of goods in a tempest for the safety of the vessel, and the raising of bulwarks on private property as a defense against a public enemy. *Short*, 194 Wash. at 432-35. The court distinguished the law of necessity, which is not dependent on the sovereign power, from the law of eminent domain, which is founded on the nature of sovereignty. *Short*, 194

Wash. at 432-33. The court set forth the rule as stated in *Nichols on Eminent Domain*:

> When immediate action is necessary in order to avert a great public calamity, private property may be controlled, damaged or even destroyed without compensation. Under such conditions any individual has the right to enter another's land and destroy his property, and if he acts with reasonable judgment he is not liable to the owner. If the individual who thus enters and destroys private property happens to be a public officer whose duty it is to avert the impending calamity, the rights of the owner of the property to compensation are no greater. The most familiar example of the exercise of this right is seen in case of a fire. The neighbors and firemen freely trespass on the adjoining land, and houses are even blown up to prevent the spread of the conflagration. The danger of a flood or the existence of a pestilence may call for equally drastic action.

1 PHILIP NICHOLS, THE LAW OF EMINENT DOMAIN § 96, at 263-64 (2d ed. 1917), *quoted in Short*, 194 Wash. at 434-35.

The landowners attempt to confine the law of necessity to emergencies that present imminent danger to human life. But nothing in *Short* suggests that the court there was concerned with the distinction between human life and property; indeed, the opinion describes the county as acting to "control an existing and most dangerous flood condition, which was likely to destroy not only appellants' property but much other property in the neighborhood." *Short*, 194 Wash. at 435. And one of the cases quoted by the court clearly states that the principle "applies as well to personal as to real estate; to goods as to houses; to life as to property." *Am. Print Works v. Lawrence*, 21 N.J.L. 248, 257 (1847), *quoted in Short*, 194 Wash. at 433.

The destruction of ornamental trees in this case is directly analogous to the appropriation of topsoil in *Short*. In both cases there was an entry upon real property with an intent to use and destroy portions of the property to abate an emergency. The beetle emergency, proclaimed by the governor in accordance with statutory emergency powers, threatened property on a much larger scale than the flood in *Short*.

The landowners argue that there could not have been a true emergency in view of the fact that the Department did not begin cutting down the trees until almost a year after the escape of the beetles. Because it takes a year for the next generation of beetles to emerge from an infested tree, the Department had a year-long window of opportunity to plan defensive action. But this opportunity to plan did not attenuate the threat of infestation or make it speculative. Instructive on this point is *Cougar Business Owners Ass'n v. State*, 97 Wn.2d 466, 647 P.2d 481 (1982). The governor proclaimed an emergency and issued certain executive orders in response to the threat of eruption at Mount St. Helens. A local business association challenged these orders on the theory that the governor lacked authority to use emergency powers until there was a "disaster," which they defined as "a specifically definable event causing harm or injury." *Cougar Bus. Owners Ass'n*, 97 Wn.2d at 475. The court found this definition too narrow. To force the State to wait until the volcano actually erupted would limit the police power to clean-up operations, and not allow for any preventative measures. This would be contrary to the legislative intent of the statutes authorizing the governor to act in an emergency. *Cougar Bus. Owners Ass'n*, 97 Wn.2d at 475. Just as the emergency was created in that case by the reactivation of the dormant volcano, the emergency was created in this case by the escape of the five beetles. The Department did not have to wait for the threatened harm of infestation to occur in order to take defensive action under the law of necessity.

The law of necessity has an affiliation with the law of nuisance, in that it recognizes the reciprocal obligations of property owners to each other and to the surrounding community. The power that the State has to prohibit such uses of property as may be injurious to the health, morals, or safety of the public is not, and cannot be, " 'burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of

their property, to inflict injury upon the community.'"
*Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S.
470, 489, 107 S. Ct. 1232, 94 L. Ed. 2d 472 (1987) (quoting
*Mugler v. Kansas*, 123 U.S. 623, 668-69, 8 S. Ct. 273, 31 L.
Ed. 205 (1887)). Property owners do not have a right to use
and enjoy their property so as to create a nuisance or
interfere with the general welfare of the community. *Conger
v. Pierce County*, 116 Wash. 27, 36, 198 P. 377 (1921). For
this reason, "the State has not 'taken' anything when it
asserts its power to enjoin the nuisance-like activity."
*Keystone*, 480 U.S. at 491 n.20; *see also Keystone*, 480 U.S.
at 492 n.22.

In this case the Department did not permanently occupy
the land; what it did, in effect, was to enjoin landowners
from maintaining species of trees that provide a safe haven
to beetles. However beautiful to look at, the trees become a
noxious use when they are in a position to spread a
pestilence.

The respondents argue, however, that the seizure of their
trees to defeat the beetle unfairly singles them out to bear
a disproportionate burden of a government program that
benefits all. They quote *Armstrong v. United States*:

> The Fifth Amendment's guarantee that private property
> shall not be taken for a public use without just compensation
> was designed to bar Government from forcing some people
> alone to bear public burdens which, in all fairness and justice,
> should be borne by the public as a whole.

*Armstrong v. United States*, 364 U.S. 40, 49, 80 S. Ct. 1563,
4 L. Ed. 2d 1554 (1960) (government could not, by enforcing
a contract right, destroy the value of liens held by
materialmen, without making just compensation). The ar-
gument for spreading the burden to the public as a whole is
not without its appeal, as was also true in *Eggleston*, *see*
148 Wn.2d at 771. But even in *Armstrong*, the United
States Supreme Court recognized that destruction or injury
to property by the government is not always a compensable
taking, and might instead be merely a consequence inciden-

tal to a valid regulatory measure. *Armstrong*, 364 U.S. at 48.

The destruction of the ornamental trees in this case is a consequence incidental to a valid regulatory measure, one taken for the purpose of defending against an impending public peril. It is analogous to the uncompensated confiscation of cedar trees in Virginia to save the apple industry from a communicable disease, an action upheld by the United States Supreme Court in *Miller v. Schoene*, 276 U.S. 272, 48 S. Ct. 246, 72 L. Ed. 568 (1928). A Virginia statute made it unlawful for a person to " 'own, plant or keep alive and standing' on his premises any red cedar tree which is or may be the source or 'host plant' of the communicable plant disease known as cedar rust." *Miller*, 276 U.S. at 277. Cedar rust did not affect the value of cedars in Virginia, but it was devastating to apple trees, which had greater commercial value. The only practicable method of protecting the apple trees was "the destruction of all red cedar trees, subject to the infection, located within two miles of apple orchards." *Miller*, 276 U.S. at 278-79. The Supreme Court found that such a statute was not violative of due process, although it allowed destruction of cedar trees without compensating landowners for their value, because Virginia was under the necessity of "making a choice between the preservation of one class of property and that of the other wherever both existed in dangerous proximity." *Miller*, 276 U.S. at 279. It would not do, the Court said, to see the statute as merely resolving a private conflict by shifting the misfortune of the apple growers to the owners of cedar trees. For "it is obvious that there may be, and that here there is, a preponderant public concern in the preservation of the one interest over the other." *Miller*, 276 U.S. at 279. As *Miller* demonstrates, when the private sacrifices that must be made to defeat a public enemy are not evenly distributed, the Constitution will not necessarily compel an equalizing adjustment.

The respondent landowners press the argument that under *Miller* and other infestation cases, compensation is always required when the State chooses to combat the

infestation by destroying healthy trees. They inaccurately interpret *Miller* as permitting the uncompensated destruction only of those trees known to be diseased. The respondents focus on the first sentence of the *Miller* opinion, where the Court refers to the destruction of cedar trees as a means of preventing the communication of a disease "with which they *were infected.*" *Miller*, 276 U.S. at 277 (emphasis added). They fail to recognize that the statute upheld by the Court permitted destruction of healthy trees (any red cedar tree "which is *or may be*" the host plant), *Miller*, 276 U.S. at 277 (emphasis added); *see also Miller*, 276 U.S. at 279 (protection of apple trees required destruction of all red cedars "subject to the infection"). *Miller* does not support the respondents' attempted distinction.

The landowners ask us to follow recent Florida Supreme Court decisions, which they interpret as requiring compensation for the destruction of any tree not known to be infested by the beetle. To protect the valuable Florida citrus industry from citrus canker, a bacterial disease that spreads primarily by wind-driven rain, Florida has undertaken programs calling for the destruction of trees and stock exposed to canker but not yet diseased. While in some cases the Florida court has characterized such destruction as a compensable taking, the cases are fact-specific and often nuanced by the fact finding of trial courts on the soundness of the government's assertion that a scorched-earth approach is a practical and necessary means of containing the disease. In one case, the Florida Supreme Court ruled broadly that the State did not have constitutional authority to destroy "healthy, but suspect citrus plants" without compensation. *Dep't of Agric. & Consumer Servs. v. Mid-Fla. Growers, Inc.*, 521 So. 2d 101, 102 (Fla. 1988). But, in that case, the trial court had found insufficient evidence to establish that mere proximity to diseased plants put the apparently healthy plants at risk. *Mid-Fla. Growers*, 521 So. 2d at 102, 104-05. Two years later the Florida court narrowed and clarified the holding of *Mid-Florida Growers* in another case involving

State-ordered destruction of all the trees at a nursery where some trees were found to be infected. *Dep't of Agric. & Consumer Servs. v. Polk*, 568 So. 2d 35, 39-40 (Fla. 1990). The court agreed that compensation was due for the destruction of noninfected trees if they did not present a nuisance or an imminent public danger. *Polk*, 568 So. 2d at 39. But the court also affirmed the trial court's order allowing even healthy trees in a zone of 125 feet from the infected trees to be destroyed without compensation. The trees within the 125-foot zone, based on evidence in the record, were held to be comparable to buildings in the path of a conflagration—a rationale akin to the law of necessity discussed by our Supreme Court in *Short v. Pierce County*, *supra*. *Mid-Florida Growers* and *Polk*, when read together, are consistent with *Miller*. Trees as yet unaffected by disease may be destroyed without compensation, when evidence in the record shows that their proximity to a source of infestation renders them "unhealthy" as a matter of law and a source of imminent public danger.

Recently, the Florida Supreme Court decided a case involving a challenge to a 2003 Florida statute known as the Citrus Canker Law, which authorizes the destruction of apparently healthy trees within 1,900 feet of a tree infected with canker. The respondents have cited this case to support their argument that the destruction of trees always requires compensation unless the trees are actually infested or diseased. *Haire v. Fla. Dep't of Agric. & Consumer Servs.*, 870 So. 2d 774 (Fla. 2004).

We do not read *Haire* as standing for such a broad proposition. In its decision, the court did not retract or modify its prior decision in *Polk*. The court simply recognized that a statutory limit on compensation of $100 per tree (or less, depending on legislative appropriations) was a floor, and did not prevent courts from ordering additional compensation in an appropriate case. With that caveat, the court upheld the statute as consistent with substantive due process, as measured by the reasonable relationship test.

*Haire*, 870 So. 2d at 782-87.

In summary, *Miller*, like *Short*, remains a powerful precedent establishing that the government will not have a constitutional obligation to compensate for property damage, if the damage is necessary to contain or abate a public calamity. The continuing vitality of this principle is illustrated in California's cases denying compensation for property damage caused by aerial spraying of insecticide to eradicate the Mediterranean Fruit Fly. *See Farmers Ins. Exch. v. State*, 175 Cal. App. 3d 494, 502, 221 Cal. Rptr. 225 (1985), *review denied*, 175 Cal. App. 3d 494 (1986); *Teresi v. State*, 180 Cal. App. 3d 239, 242-43, 225 Cal. Rptr. 517 (1986). As discussed above, we do not see Florida's cases as inconsistent with *Short* or *Miller*. But in any event, California's decisions would be more persuasive because the takings clause in California's constitution was a model for Washington's. *Eggleston*, 148 Wn.2d at 772 n.8 (citing ROBERT F. UTTER & HUGH D. SPITZER, THE WASHINGTON STATE CONSTITUTION: A REFERENCE GUIDE 30 (2002)).

Respondents Kissinger and Gorgey request, if the trial court's order is not affirmed as a categorical taking under *Loretto*, that the case be remanded to determine whether a compensable regulatory taking occurred under the factors set forth in *Penn Central Transportation Co.*, 438 U.S. 104. In the hearing below, they did not argue in the alternative for a regulatory taking analysis under *Penn Central*. Indeed, their brief on appeal unequivocally states that "the case at bar is **not** a regulatory taking case."[6] Because the alternative *Penn Central* analysis was not presented below, is not well briefed on appeal, and does not appear to have application in any event because the destruction of the trees was necessary to meet an extremely threatening emergency, we deny the request for a remand.

We conclude the Department's destruction of trees within one-eighth of a mile of the beetle escape site was not a

---

[6] Br. of Resp'ts Kissinger and Gorgey at 7.

compensable taking. The judgment for compensation is reversed.

GROSSE and AGID, JJ, concur.

Review denied at 152 Wn.2d 1032 (2004).